**Guttilla Murphy Anderson**
**Ryan W. Anderson** (Ariz. No. 020974)
5415 E. High St., Suite 200
Phoenix, Arizona 85054
Email: randerson@gamlaw.com
Phone: (480) 304-8300
Fax: (480) 304-8301
Co-Special Insurance Counsel for Edward M. Wolkowitz, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In Re: | Chapter 7 |
| Pacific Theatres Exhibition Corp., et al., | Lead Case No. 2:21-bk-15007-BB |
| Debtors | Jointly administered with:<br>2:21-bk-15008-BB (Pacific Theatres Entertainment Corporation)<br>2:21-bk-15009-BB (Pacific Cinemas Corporation)<br>2:21-bk-15010-BB (Glendale Americana Theatre, LLC)<br>2:21-bk-15011-BB (ArcLight Cinema Company)<br>2:21-bk-15012-BB (ArcLight Visions, Inc.) |
| | Adv. Case No. _____ |
| Edward M. Wolkowitz, Chapter 7 Trustee,<br><br>Plaintiff,<br>v.<br><br>Allied World National Assurance Company,<br><br>Defendant, | **COMPLAINT**<br><br>**(BREACH OF CONTRACT, UNFAIR COMPETITION, BAD FAITH, NEGLIGENT MISREPRESENTATION, DECLARATORY JUDGMENT)** |

Plaintiff Edward M. Wolkowitz in his capacity as the duly appointed Chapter 7 Trustee ("Trustee") for the bankruptcy estates of Pacific Theatres Exhibition Corp. ("Exhibition"),

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

Pacific Theatres Entertainment Corporation ("Entertainment"), ArcLight Cinema Company ("ACC"), Arclight Visions, Inc. ("AVI"), Glendale Americana Theatre, LLC ("GAT"), and Pacific Cinemas Corporation ("PCC") for his complaint against Defendant Allied World National Assurance Company states and alleges as follows:

## **INTRODUCTION**

1.     This action arises out of an insurance dispute over the coverage available for business losses suffered by Exhibition, Entertainment, ACC, AVI, GAT and PCC flowing from an insurance policy issued by Defendant Allied World National Assurance Company ("Allied World").

2.     The Trustee asserts claims for breach of contract, bad faith, negligent misrepresentation, or as an alternative to its other theories of liability, violation of California Business and Professional Code §17200, *et. seq*. and a declaratory judgment arising from Allied World's wrongful refusal to pay its insureds Exhibition, Entertainment, ACC, AVI, GAT and PCC (collectively the "Insureds") claims for direct physical loss of or damage to property and related business income as well as other losses including but not limited to decontamination and clean up expense, extra expense and other losses, costs and extra expenses which occurred at seventeen of its movie theater locations in various states throughout the country between March 11, 2020, and which continue through the present date as well as its failure to reasonably refund premiums as a result of business closures and substantial reduction in actuarial risk.

3.     On April 6, 2020, Allied World countersigned and issued its Insureds, insurance policy number 0312-1527-1N providing up to $2,000,000 in insurance coverage

**Gutilla Murphy Anderson, P.C.**
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

1  to its Insureds for policy period between December 15, 2019 and December 15, 2020 and

2  covering up to ten percent of all risks of loss of or damage to property and which were

3  designed to protect Insureds businesses in the event its premises suffered damage or were

4  rendered unsafe for intended use.

5       4.      By the time Allied World countersigned and forwarded the policy of insurance

6  it to its insureds on or about April 6, 2020, all of its Insureds' businesses had been forcibly

7  closed for at least one month following government closure orders as a result of the

8  coronavirus pandemic. However, despite dramatically reduced risks to Allied World from

9  the shuttered business operations of the Insureds, Allied World did not reduce any

10  commercial insurance premiums nor did Allied World explain when it issued and delivered

11  the fully countersigned policy that it would not provide coverage for the only known risks

12  facing its Insureds at that time.

13      5.      Approximately three weeks after receiving the fully countersigned policy, the

14  Insureds submitted a property loss notice to Allied World. Among other things, the Insureds

15  explained in further detail that its estimated losses from March 16, 2020 through December

16  31, 2020 totaled "in excess of $80,000,000".

17      6.      Insureds seek to enforce the contractual obligations owed to them by Allied

18  World pursuant to the terms and conditions of the property insurance policy number 0312-

19  1527-1N Allied World sold to its Insureds covering the time period December 15, 2019

20  through December 15, 2020.

21

22

7.    Allied World's insurance policy, attached herein as Exhibit "A" and incorporated herein by reference agreed to cover its Insureds locations including but not limited to its Insureds movie theaters in California, Maryland, Massachusetts and Illinois.

8.    The Allied World insurance policy requires payment of a claim when an insured suffered direct physical loss of or damage to property.

9.    The Allied World insurance policy insures all risk of loss except if it is specifically excluded by the policy.

10.    The Allied World policy extends coverage on the all-risk policy for business interruption as follows (as modified by Amendments to a Broker Manuscript Policy Form):

    a.    **Contingent Time Element**:  property that wholly or partially prevents any direct supplier of goods and/or services to the Insured from rendering their goods and/or services, or property that wholly or partially prevents any direct receiver of goods and/or services from the Insured from accepting the Insured's goods and/or services, such supplier or receiver to be located anywhere in the world;

    b.    **Leader Property**:  property not owned or operated by the Insured, located within 5 miles of the Insured, which attracts business to the Insured;

    c.    **Interruption by Civil or Military Authority**: This policy is extended to cover the loss sustained during the period of time when access to real or personal property is impaired by order or action of civil or military authority issued in connection with or following a peril insured against.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

1    Coverage under this Extension is limited to 90 Days from the date that

2    the Interruption begins, and to within 5 miles of the Insured premises.

3        d.    **Ingress/Egress**:    This policy is extended to cover the loss sustained

4    during the period of time when, in connection with or following a peril

5    insured against, access to or egress from real or personal property is

6    impaired irrespective of whether the premises or property of the Insured

7    shall have been damaged.  Coverage under this Extension is limited to

8    90 days from the date that the interruption begins, and to within 5 miles

9    of the Insured premises.

10    11.    The Allied World policy provides additional coverage as follows:

11        a.    **Decontamination and Cleanup Expense**:  This policy insures any cost

12    or expense of decontamination or removal or dispersal of water, soil or

13    any similar substance on or under the premises of the Insured incurred

14    during emergency measures undertaken in order to mitigate any

15    circumstances pertaining to seepage, pollution and/or contamination,

16    whether or not at the instruction of any government agency or authority.

17        b.    It is the condition precedent to recovery under this clause that the

18    Insurer shall have paid, or agree to pay for, loss or damage to property

19    insured here under unless such payment is precluded by operation of

20    any deductible.

21        c.    It is also a condition precedent to any recovery under this clause that the

22    Insured shall give written notice to the Insurer of intent to claim for

Gutilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

1    decontamination and clean up expense not late than 365 days after the

2    date of such loss or damage.

3    12.    Insureds seek a declaration that between the reporting date of March 11, 2020,

4    to the present, its Insured suffered from a physical loss of or damage to property and

5    continues to suffer damages resulting from Allied World's denial of coverage for claims

6    which should have been covered by the Allied World policy.

7    13.    Insureds seek a declaration that the terms of the Policy issued by Allied World

8    obligate it to: (a) pay for the direct physical loss or damage to property that its Insureds

9    suffered; (b) pay all business interruption losses and/or extra expense incurred, including

10    expenses that would not have been incurred if there had not been direct physical loss of or

11    damage to property, (c) pay expenses to avoid or minimize the suspension of business and

12    extra expenses required to remediate, repair and replace property; (d) to pay all expenses for

13    losses falling within the scope of the Allied World coverages no matter how denominated

14    including but not limited to civil authority, extended business interruption losses, dependent

15    property, ingress/egress, and/or decontamination and cleanup expense.

16    14.    Insureds also seek a declaration that the physical presence and/or likely

17    presence of SARS-CoV-2 in or on Insureds property during the time periods March 11, 2020,

18    through December 31, 2020, and likely presence throughout communities adjacent to its

19    properties located in California, Maryland, Massachusetts and Illinois actually altered the air

20    and property of Insureds physically attaching to surfaces binding to its surfaces through

21    physiochemical reactions involving surfaces on property triggered coverage under the Allied

22

World policy because Insureds suffered direct physical loss of or damage to Insureds' property.

15.     Insureds seek a declaration that the substantial certainty of and actual physical presence of SARS-CoV-2 at Insureds' properties as well as the need to alter the physical premises and/or loss of use of covered properties as a result of them being rendered unsafe or unusable for intended purposes triggered coverage under the Allied World policy including coverage for business interruption, extra expense, dependent property, ingress/egress and/or decontamination and clean up coverage as defined by the terms of the Allied World policy.

16.     Insureds seek a declaration that based upon the allegations spelled out in this Complaint, Insureds suffered from a distinct, demonstrable, physical alteration of Insureds' property.

17.     Insureds also seek a declaration that they are covered by the Allied World policy which provides coverage to "The Decurion Corporation and its affiliated, subsidiary, an associated companies and/or corporations, partnerships and joint ventures as now exist or may hereafter be constituted or acquired and any party interest which the Insured is responsible to insure."

18.     The Allied World policy promised Insureds to provide them with coverage "against all risk of direct physical loss or damage to property…" The policy does not define the terms "direct physical loss or damage to".   According to ordinary meaning and usage of these terms, "direct physical loss or damage to" requires:

a.      Physical damage to insured's property

7

b.      Structural alteration of property

c.      Physical attachment and/or interaction of a substance or force on the property including the air rendering the property unsafe, or uninhabitable for normal use or having effect on the usability of the property

d.      Loss of ability to use or loss of functional use of property in whole or in part.

19.     The Allied World policy contains no exclusion arising from the presence and/or likely presence of any virus such as SARS-CoV-2 on the Insureds premises.

20.     Insureds seek a declaration that various orders issued by governmental authorities in all jurisdictions in which Insureds operated, including but not limited to Insureds locations in California, Maryland, Massachusetts and Illinois confirmed the likely existence and presence of SARS-CoV-2 on the premises of each of its locations and also impaired Insured from partially or wholly operating, such impairment related to a peril against which the Allied World policy insured because it impaired the functionality of Insureds' property.

21.     Insureds seek a declaration that the actual or likely presence SARS-CoV-2 on the Insureds premises during the time period March 11, 2020, through December 31, 2020, constitutes "direct physical loss of or damage" to its properties sufficient to trigger coverage under all applicable provisions of the applicable Allied World policy.

22.     Insureds likewise seek a declaration that by Allied World's  failure to communicate anything about policy limitations in coverage or to offer any refund premiums

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

reflecting a reduction in risk around the time Allied World countersigned and forwarded the policy of insurance it to its Insureds on or about April 6, 2020, that Allied World breached its contractual obligations to treat its Insured in good faith or alternatively breached the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et. seq*.

### PARTIES

23.     Pacific Theatres Exhibition Corporation, Pacific Theaters Entertainment Corporation, ArcLight Cinema Company, ArcLight Visions, Inc., LLC and Glendale Americana Theatre LLC (Collectively the "Debtors" or "Pacific"), are corporations or limited liability companies with their principal places of business in Los Angeles, California.

24.     On approximately, June 18, 2021, each of the Debtors filed a petition for Chapter 7 bankruptcy protection.  The cases are currently being jointly administered under Case No. 2:21-bk-15007-BB.  Plaintiff Edward M. Wolkowitz is the duly appointed Chapter 7 Trustee for the bankruptcy estates of each of the Debtors in their cases identified in the caption to this Complaint.

25.     Upon information and belief, Defendant Allied World is an insurance company and has been engaged in the business of selling property insurance and other insurance policies and products to, among others companies such as Pacific doing business in all states in which Pacific operates such as California, Maryland, Massachusetts and Illinois.

### JURISDICTION AND VENUE

26.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure, and an action for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

9

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

27.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §1334 because this case arises out of or is related to the above-referenced jointly administered cases in this Court.  The policy and proceeds of said policy at issue in this case is an asset of the jointly administered bankruptcy estates and the losses for which Pacific seeks coverage will be contributed to and subject to oversight and administration of the bankruptcy estates.

28.     The Allied World Policy Number 0312-1527-1N is an asset of the estate which requires administration, and which affects the orderly liquidation of all assets of the estate for the benefit of creditors. 28 U.S.C. § 157(b)(2)(A); § 157(b)(2)(O).

29.     As an insurance coverage action which impacts an important asset of the Chapter 7 estate, issues raised in this adversary proceeding are core proceedings. *See, e.g., Cont'l Ins. Co. v. Thorpe Insulation Co.* (*In re Thorpe Insulation Co.*), 671 F.3d 1011, 1022 (9th Cir. 2012) ("[W]e hold that the resolution of [the coverage action] was a core matter in the bankruptcy"), *cert. denied*, 568 U.S. 815 (2012); *see also Koken v. Reliance Grp. Holdings, Inc. (In re Reliance Grp. Holdings, Inc.*), 273 B.R. 374, 396 (E.D. Pa. 2002) ("Case law … supports the conclusion that an action for declaratory relief regarding the debtor's rights under insurance policies is a core proceeding.").

30.     Resolution of this Adversary Proceeding involves the administration of the bankruptcy estate and liquidation of an important asset of the Estate, an insurance policy, which will significantly impact the amounts in the Estate available for distribution to creditors. As such, this adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(A) & (O) and the losses for which Pacific seeks in this proceeding continue post-petition and the dispute arising from this proceeding under this Policy with

1  Allied World arose formally post-petition affecting the orderly liquidation of assets of the

2  estates.

3      31.    Venue is proper for this proceeding pursuant to 28 U.S.C. §1409.

4                          **PACIFIC'S BUSINESS OPERATIONS**

5      32.    Pacific operated movie theaters at locations throughout the states of California,

6  Maryland, Massachusetts and Illinois during all times relevant to this Adversary Complaint.

7      33.    On December 15, 2019, the starting date for the Allied World all-risk policy,

8  Allied World charged a premium for all-risk commercial insurance coverage totaling

9  $119,700 based in part upon the nature and condition of all Pacific locations throughout the

10  states of California, Maryland, Massachusetts and Illinois all which were open to the public

11  at that time.

12      34.    All seventeen locations identified by Pacific in its request for coverage are

13  insured by the Allied World policy providing coverage between December 15, 2019 through

14  December 15, 2020.

15      35.    As of March 16, 2020, all Pacific theater locations were fully closed to the

16  public for any type of continued operations and remained closed between March 16, 2020

17  and at least December 31, 2020.

18      36.    Between March 11, 2020 and December, 31, 2020, business interruption losses

19  were reported to Allied World in excess of $80,000,000 relating to seventeen of Pacific's

20  business locations throughout the states of California, Maryland, Massachusetts and Illinois.

21

22

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

37.    When Allied World's representative countersigned and delivered the policy of insurance to its insured on April 6, 2020, all Pacific theater locations were closed to the public for reasons related to the COVID-19 pandemic.

38.    At the time Allied World countersigned and delivered the policy of insurance to its insured, Allied World did not disclose any policy limitations in its all-risk commercial insurance policy nor did it offer to refund any policy premiums which were originally calculated based upon the status of each location as open to the public.

## THE COVID-19 PANDEMIC

39.    Around December, 2020 during the term of the Allied World policy of insurance, an outbreak of illness caused by a novel corona virus known as SARS-CoV-2 began and first identified in the Wuhan province in the country of China.  The illness also has known as COVID-19 and quickly spread throughout the world across Europe and into the United States.

40.    COVID-19 is highly transmissible spreading rapidly.  In early January 2020, after receiving substantial public information about risk of a pandemic, persons within the United States became infected with a highly contagious virus. On January 31, 2020, the United States Department of Health and Human Services Secretary declared a public health emergency to address the 2019 novel coronavirus (COVID-19).

41.    According to the World Health Organization, "The disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks. These droplets are relatively heavy, do not travel far and quickly sink to the ground. People can catch COVID-19 if they

12

1    breathe in these droplets from a person infected with the virus.  This is why it is important to

2    stay at least one [meter] away from others. These droplets can land on objects and surfaces

3    around the person such as tables, doorknobs and handrails." "How does COVID-19 spread?,"

4    World Health Organization (April 17, 2020) (emphasis added).

5          42.    By January 31, 2020, it was common knowledge that the COVID-19 virus is

6    highly contagious and easily spread affecting millions in a matter of months and spreading

7    through respiratory droplets and lingering on surfaces.

8          43.    On March 16, 2020, the United States Centers for Disease Control and

9    Prevention issued guidance recommending individuals avoid social gatherings of more than

10   ten people and avoid any businesses that allow gathering of more than ten people; instead

11   recommending the use of drive-thru, pickup or delivery options at business, restaurants and

12   bars, all of which were designed to slow the spread of the COVID-19 virus.

13         44.    At all relevant times alleged herein, Pacific operated theaters exhibiting motion

14   pictures throughout the year at seventeen different locations throughout the four states

15   identified above.  The public health emergencies identified by state and federal agencies

16   directly impacted Pacific's ability to operate and the highly transmissible nature of COVID-

17   19 made the presence of the virus at each different location throughout the four states

18   identified above highly likely negatively affecting the use and functionality of each Pacific

19   location.

20         45.    Around March, 2020, COVID-19 was substantially likely to be present at one

21   or all of Pacific theatre's seventeen location of operations.

22

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

46.    During the first two weeks of March, 2020, to mitigate the spread of COVID-19 presence at and around Pacific theatre locations, all Pacific operations were closed and ceased operations.

47.    Pacific ceased normal operations based in part on the highly transmissible nature of COVID-19, risk of its presence at each theater location if each location remained open and after March 16, 2020 and executive orders in California, Maryland, Massachusetts and Illinois responding to conclusions that the COVID-19 virus had been spreading rapidly.

48.    During the first weeks of March, 2020, Governors of the States of California, Maryland, Massachusetts, and Illinois issued executive orders requiring closure of all non-essential business operations.

49.    Governors in each states dictated strict rules regarding the operation of various businesses and further provided additional provisions and requirements for all businesses.

50.    Each executive order contained enforcement provisions that failure to comply may lead to enforcement actions including but not limited to the potential for public nuisance actions to abate risks.

51.    During the 2020 time period while business operations were suspended, it was common knowledge that carriers of the COVID-19 virus may be asymptomatic and when persons became ill, the outcome can be deadly, creating a destructive public health crisis not seen in years.

52.    Upon information and belief, physical presence of COVID-19 was highly likely to exist at Pacific's properties as demonstrated by positive infections occurring around Pacific properties during the time period in which interruption claims were pending.

14

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

53.    The public health crisis and community spread of COVID-19 likely infected employees and/or members of the public and required cessation of Pacific operations, which were not fully restored and instead forced Pacific into bankruptcy.

## COVID-19 CAUSES DIRECT PHYSICAL LOSS AND DAMAGE

54.    Pacific presented a notice of claim to Allied World dated April 30, 2020, approximately twenty-four days after Allied World had countersigned and delivered the fully executed policy of insurance to its insured on April 6, 2020.

55.    As of April 6, 2020, the date Pacific had countersigned and delivered the fully executed policy of insurance to its insured, Pacific theaters had all already been fully closed down, had ceased operations entirely and were not open to the public.

56.    Around April 30, 2020, the time-period in which claims were presented to Allied World, Pacific's business locations had been rendered unsafe and unusable as a result of the COVID-19 exposure issues raised during this health crisis and likely risk of and actual physical presence of the COVID-19 virus at its premises.  The presence of a few patrons or many patrons on site results in further contagion risk and renders property unsafe.

57.    The mere presence of infectious COVID-19 and risk of presence of COVID-19 at Pacific's premises required risk mitigation cost and rendered its premises unusable as intended and as insured.

58.    The mere presence of and risk of presence of COVID-19 as well as government shutdown orders and/or separate prevention of ingress and/or egress to the premises occasioned by the presence of COVID-19 at Pacific's premises rendered it unusable as intended triggering coverage on the Allied World insurance policy.

59.   Pacific's risk mitigation costs and sanitation strategies as a result of contamination of COVID-19 at its multiple premises altered its properties and required additional expense and mitigation costs.

60.   The expenses and business interruption loss resulting from government shutdown orders, from prevention of ingress and/or egress to its premises, and from the COVID-19 virus triggered Pacific's business interruption coverage that it purchased from Allied World believing that because it timely paid its insurance premiums, its insurer would provide protection and coverage to it in times of need.

61.   Harm to the property by the presence of infectious COVID-19 particles highly likely to have been located on surfaces on Pacific's premises together with multi-jurisdiction government shutdown orders and/or prevention of ingress/egress due to presence of and risk of COVID-19 at Pacific's premises demonstrates a sufficient showing of direct physical loss of or damage to the premises insured by Allied World which should have triggered coverage for claims.

62.   At the time it countersigned and delivered the Allied World commercial insurance policy to its insureds on April 6, 2020, Allied World was aware that the presence of and/or risk of COVID-19 presence and resultant impact on its insured represented the most pressing fortuitous risk to its insureds yet Allied World failed to disclose any limitations on coverage to its insureds at the time of delivery of its policy of insurance to its insured.

63.   Virologists and researchers alike have routinely confirmed that COVID-19 remains viable and active on physical surfaces and in the air.  The persistent presence of the

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

SARS-CoV-2 on surfaces and in the air damages buildings and property rendering them damaged, unsafe, unfit, and inhabitable for normal use and occupancy.

64.     SARS-CoV-2 and COVID-19 alters conditions of properties and buildings such as Pacific's and as a result causes either direct physical loss or damage or both to property.

65.     SARS-CoV-2 is contained in respiratory droplets that are expelled by infected individuals and land on and adhere to surfaces physically changing them as "fomites." Fomites, objects, become mechanisms previously safe for handling and touch that become agents for transmission of SARS-CoV-2 making physical changes to air and property rendering it unsafe.

66.     When infected individuals expel SARS-SoV-2 the physical property walls, tables, chairs, rails, flooring, sinks, etc. becomes physically unsafe and potentially deadly. Such property must be fully remedied but based upon statistically certainty of ongoing and continued exposure and infection rates during the 2020 time period of this claim, the likelihood of full remediation was impossible as long as the premises was open to the public, and re-infection risks at property remained.

67.     It is apparent from scientific literature that COVID-19 is also spread through indoor airborne transmission and infecting and damaging premises in much a similar manner as fumes, smells and other odors have damaged property in other claims made and accepted for loss or damage to property.

68.     The presence of fomites, droplets and aerosols containing COVID-19 cause direct physical loss of and/or damage to and tangibly alters property, physically altering

17

surfaces and air on a molecular level, requiring remediation, substantial regular decontamination, changes to structures, installation of filtration systems, and causes direct physical loss of or damage to property that renders it unsafe for intended functions and potentially dangerous to members of the public absent substantial remediation and contamination cost.

69.    Scientific evidence demonstrates that during all times relevant to this Complaint, routine use of disinfectants do not prevent the transmission of COVID-19 onto surfaces (fomites) and instead, the virus "As assessed with measures of viral RNA presence, CoV presence was not significantly altered, and CoV was much more resilient to the cleaning than most other respiratory viruses so tested." Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020), https://onlinelibrary.wiley.com/doi/10.1002/jmv.26170 (last accessed May 26, 2023).

70.    During the time periods as alleged in this Complaint, even trained hospital workers using hospital approved disinfectants were not able to eliminate COVID-19 presence on its property and attempts at routine cleaning on Insureds property would not have successfully removed the bonding on physical property (fomites) and physical presence in Insureds property. Zarina Brune et. al. Effectiveness of SARS-CoV-2 Decontamination and Containment in a COVID-19 ICU, 18 INT'L J. ENV'T RSCH. & PUB. HEALTH 5, 2479 (March 3, 2021), https://www.mdpi.com/1660-4601/18/5/2479 (last accessed May 26, 2023).

Guttila Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

18

71.    According to the California Medical Association, the State of California's non-profit medical professional physician's association:

> Scientific evidence … shows that the COVID-19 virus is persistent rather than evanescent.  Moreover, no amount of no amount of cleaning, disinfection or even the dissipation of the COVID-19 virus with the passage of time, will protect an indoor space from reintroduction of the virus if the space is open to persons infected with COVID-19.

quoted in *Saddle Ranch Sunset, LLC v. Firemans Fund Ins. Co.*, Cal. App. No. B313609 (Oct. 7, 2022) (*amicus curiae* brief of the California Medical Association).

72.    The direct physical loss of or damage to property described in this section occurred at Pacific's locations throughout the United States.  Pacific was forced to consider taking substantial steps to preserve and protect its properties and indeed was later forced to file for bankruptcy protection in part as a result of such requirements to make its properties as safe as it could possibly make for regular use.

73.    Two of the earliest deaths due to COVID-19 occurred in California the state in which several of Pacific theaters were located.

74.    In and around early 2020, the government did not have best practice procedures in effect to mitigate the spread of the COVID-19 virus.  At this time and the time period in which Pacific's policy was in effect, the public health system was unable to stop the spread of the virus throughout the communities where Pacific theaters were located.

75.    Around this time period, as evidenced in part by local and state shutdown orders, Pacific theaters were not safe for public operations which in turn led to loss and damage to properties particularly because the virus spread largely undetected throughout the United States in 2020.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

76.     It is a statistical certainty that SARS-CoV-2 and/or COVID-19 circulated in both the air and all seventeen of Pacific properties located throughout the United States.  As early as February 26, 2020, the Center for Disease Control advised the public that COVID-19 was spreading freely without the ability to trace the origin of new infections and around April, 2020, the time period in which Allied World countersigned and returned its policy of insurance to Pacific, due to pervasive spread and presence of COVID-19 throughout the world, the virus was presumed to be likely present everywhere.  *See* Christopher Ingraham, At the population level, the coronavirus is almost literally everywhere, WASH. POST. Apr. 1, 2020 accessed at https://www.washingtonpost.com/business/2020/04/01/population-level-coronavirus-is-almost-literally-everywhere/.

77.     Had Pacific operations remained open, due to such statistical certainty, remediation efforts would not have been possible due to the overwhelming certainty of continued and on-going exposure to infection each time a customer would walk into the property as well as the substantial certainty that droplets would bond onto physical surfaces with or without ongoing and continuous routine cleaning.

78.     Upon information and belief, by March 16, 2020, the California Department of Public Health and all counties issued guidance directing businesses to close operations to the public in an effort to limit spread of the COVID-19 virus and likely presence of the virus at all businesses open to the public.  Upon information and belief, California orders directing businesses to close were in part "based on scientific evidence regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, as well as best practices currently known and available to protect vulnerable

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

members of the public from avoidable risk of serious illness or death resulting from exposure

to COVID-19."    County of San Diego Order of the Health Officer and Emergency

Regulations dated March 29, 2020, at ¶4 (superseded).

79.    According to the San Diego County Chief Administrative Officer, Director of

Emergency Services, County of San Diego, around March, 2020, government health

authorities issued an order preventing business gatherings  to prevent exacerbation of spread

of COVID-19 "such as 1) the increase likelihood that gatherings will attract people from a

broad geographic area; 2) the prolonged time period in which large numbers of people are in

close proximity; 3) the difficulty in tracing exposure when large numbers of people attend a

single event or are at a single location; and 4) the inability to ensure that such persons follow

adequate hygienic practices." *Id*.

80.    Such risks outlined by California emergency services authorities necessitated

closure of Pacific businesses during the same time period that Allied World countersigned

and issued the new commercial insurance policy to Pacific without disclosing any coverage

limitations and without offering to refund any policy premiums to its insured.

81.    Upon information and belief, by March 23, 2020, the Governor of Maryland

restated and prohibited large gatherings and events, closing theaters due to the risk of and

likely presence of virus at public businesses and venues such as theaters.   Order of the

Governor of Maryland Number 20-03-23-01.   Specifically, the Maryland Governor's

executive order preventing gatherings larger than ten persons and closing non-essential

businesses including theaters stated in part, "To protect the public health, welfare, and safety,

prevent the transmission of the novel coronavirus, control the spread of COVID-19, and save

Gutilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

1    lives, it is necessary to control and direct the movement of individuals in Maryland, including

2    those on the public streets….It is further necessary to control and direct in Maryland the

3    occupancy and use of buildings and premises, as well as places of amusement and

4    assembly….”

5        82.    Upon information and belief, by March 16, 2020, based in part on the number

6    of presumptive and confirmed cases of COVID-19 and Center for Disease Control and

7    Prevention recommendations for community mitigation strategies, the Governor of

8    Massachusetts issued an executive order dated March 15, 2020 prohibiting public gatherings

9    of more than twenty-five people at theaters and meeting halls, gymnasiums, and fitness

10    centers and also prohibiting consumption of food and drink on business premises based on

11    likely spread, presence of and risk of spread of virus on business properties.

12        83.    Upon information and belief, by March 16, 2020 the Governor of Illinois

13    likewise restricted public gatherings and required businesses to close based in part on the

14    scientific certainty of the presence of virus on business properties including but not limited

15    to Pacific's property.  In Governor's Executive Order Number 2020-07, Illinois Governor

16    Pritzker indicated in part that "frequently used surfaces in public settings, including bars and

17    restaurants, if not cleaned and disinfected frequently and properly, also pose a risk of

18    exposure… [and] the danger of the [COVID-19] virus poses to the public health and wellness

19    require the reduction of on-premises consumption of food and beverages…"

20        84.    The orders mandating businesses to shut down acknowledge that the virus

21    causes physical loss or damage to property.

22

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

22

Gutilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

85.     Before shut down orders took effect in the states and counties in which Pacific properties were located, thousands of customers would attend theater and swap meet functions at all of Pacific properties every day.  Given the number of infected people who were infected around the time of shut down orders required business closures, it is a certainty that infected individuals both symptomatic and asymptomatic were present in Pacific theater properties on a day basis before shutdown orders were issued and took effect.

86.     The virtual certain presence of infected individuals at Pacific properties virtually assured the presence of virus on property in the form of fomites and in aerosolized format at Pacific properties because infected individuals have expelled droplets containing virus by simply talking, sneezing and coughing which in turn deposited virus particles on surfaces at all of Pacific properties.  The visits previous to closure orders caused direct physical loss or damage to Pacific properties.

87.     The statistically probable presence of SARS-CoV-2 at Pacific locations and inability to use its locations safely for intended purposes necessitated attempts to alter physical spaces to ensure safety of employees and members of the public.

88.     The statistically probable presence of SARS-CoV-2 at Pacific locations and inability to use its locations safely for intended purposes the need to alter locations in response, government shut down orders and inability to earn business income have proven to be a financial disaster for Pacific forcing them so seek bankruptcy protection and permanently shut down operations.

89.     The threat of or actual presence of COVID-19 on Pacific property should be construed as physical loss or damage to property in much the same way as the threat or

23

presence of other disease-causing agents on Pacific property because the property is rendered unusable for its intended purpose.

### THE ALLIED WORLD POLICY AND ITS UNREASONABLE CONDUCT

90.    Allied World promised to pay Pacific for its business interruption and necessary extra expenses occurring as a result of prevention of ingress or egress to business locations not specifically caused by an order from a civil authority or government shutdown order.

91.    Upon information and belief, Allied World was a participant in a consortium of other insurers all of whom promised to provide up to $20,000,000 in coverage with Allied World promising to participate up to $2,000,000 in coverage at a participation rate of ten percent (10%) for claims made for coverage.

92.    The Allied World policy contains various sub-limits of liability coverage identified with the policy and declarations.

93.    Pacific's damages, business interruption losses and/or rental value loss, extra expense and other losses are covered by the Allied World policy.

94.    The Allied World policy requires payment for:

    a.    Loss resulting from necessary interruption of business conducted by the Insured, whether total or partial, and cause by loss, damage or destruction covered herein during the term of this policy to Real and Personal Property …

    b.    If such loss occurs during the term of this policy, it shall be adjusted on the basis of ACTUAL LOSS SUSTAINED by the Insured, consisting

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

24

of the net profit which is thereby prevented from being earned and of
all charges and expenses only to the extent that these must necessarily
continue during the interruption of business including Ordinary Payroll
and only to the extent such charges and expenses would have bene
earned had no loss occurred.

    c.    "Ordinary payroll" is defined to be the entire payroll expense for all
employees of the Insured except officers, executives, department
managers, employees under contract, and other important employees as
determined by the Insured.

95.    Upon information and belief, other insurance carrier participants in the
insurance program provided to Pacific included separate policy exclusions and/or sublimits
whether framed as an "organic pathogen exclusion" or a "pollution and contamination
exclusion." Each carrier has in turned denied Pacific claims in reliance on these alleged
exclusions from coverage.

96.    The Allied World policy does not include any exclusion no matter how framed
for claims arising from exposure to or presence of viruses on business property.

97.    Paragraph Thirty-Seven of the Policy Coverage Section of the Allied World
Policy requires a computation of earned premiums on a "pro-rata basis" in the event of
cancellation of coverage.

98.    In the declarations section of the policy issued to Pacific, Allied World imposes
a minimum premium charge of $29,925 in the event of cancellation irrespective of whether
risks have changed or reasons why the policy had been cancelled.

99.    Allied World controlled all policy language in the insurance policy issued to Pacific and could have chosen industry trade group language to include or not to include in the policy issued and Pacific did not participate in nor did it have any bargaining power to alter or negotiate specific terms of the Allied World policy issued to it; Pacific had no ability to change or modify policy terms chosen or omitted from the policy issued to it.

100.    Upon information and belief, in 2006, the Insurance Services Office ("ISO") issued an information circular to its insurance company customers recommending that insurers include a policy exclusion form adding an endorsement specifically excluding coverage for losses due to bacteria and viruses.

101.    Upon information and belief, in 2006, ISO recommended to its insurance company clients that its clients/insurance carriers exclude claims for coverage "caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

102.    Upon information and belief, in 2006, ISO recommended carriers exclude coverage for claims relating to bacteria or viruses based in part on SARS, rotavirus and influenza infections which alerted ISO to possible exposure to costly claims for coverage that existed at the time.

103.    Upon information and belief, in 2006, at the time it recommended coverage exclusions for virus and bacteria exposure, the organization recognized that generalized policy exclusions may be wholly insufficient to limit coverage for "all risk" insurance policies that did not exclude coverage for viruses or bacteria exposure.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

104.    Upon information and belief, Allied World had access to proposed policy exclusions for loss due to viruses or bacteria exposure from ISO over the past fourteen years but did not adopt any endorsements excluding coverage to Pacific.

105.    Allied World could have but did not add an endorsement to Pacific's insurance policy excluding any coverage for losses occasioned by virus or bacteria exposure.

106.    Upon information and belief, Allied World could have issued the commercial policy to plaintiff drawing on specific policy language, endorsements, exclusions and terms directly from the trade association known as the Insurance Services Office (ISO).

107.    Upon information and belief, ISO provides a range of services to its customers in the property casualty insurance industry maintaining actuarial data, underwriting guidance, claims information and other tools to its insurance carrier clients.

108.    According to its web site, "ISO provides advisory services and information to many insurance companies. On your insurance policies, you may see notices showing ISO (Insurance Services Office, Inc.) as the copyright owner. That's because ISO develops and publishes policy language that many insurance companies use as the basis for their products." www.verisk.com/insurance/about/faq.

109.    The extra expenses and business interruption losses resulting from the COVID-19 virus triggered Pacific's business interruption and extra expense coverage that it purchased from Allied World believing that because it timely paid its insurance premiums, its insurer would provide protection and coverage to it in times of need.

110.    During any and all time periods in which Executive orders required cessation of operations, Pacific suffered business interruption and necessary extra expense while

existing ingress or egress to its property was rendered unsafe during a time of the COVID-19 virus pandemic and major health crisis and during the time in which infectious COVID-19 were upon information and belief present at the premises creating unnecessary risk to patrons and employees and preventing ingress and egress access.

111.    Upon information and belief, Allied World did not reasonably consider applicable ingress or egress coverage when it denied claims and Pacific suffered substantial business interruption losses and necessary extra expenses as a result.

112.    Upon information and belief, Allied World received a notice of claim from its insured dated April 30, 2020.

113.    Allied World, through its third-party claims administrator issued a reservation of rights to its insured on or about June 25, 2020 and requested additional information.

114.    On January 6, 2021 a representative of Pacific's parent corporation provided a letter to Allied World's third party claims administrator spelling out specific business interruption losses for all Pacific properties and confirming that the total business losses suffered by Pacific between March 16, 2020 and December 31, 2020 exceeded $80,331,024.

115.    On April 23, 2020, Allied World's third party claims administrator denied the claims for coverage for the more than $80,331,024 in losses related to COVID-19.

116.    The Allied World's third party claims administrator letter dated April 23, 2021 denying Pacific's claims did not construe coverage in a manner that gives equal consideration to the interest of its insureds.

117.    A showing of direct physical loss of or damage to property triggers coverage on an all-risk insurance policy when an insured alleges presence of bacteria, odors, smoke,

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

cat urine, ammonia, pesticide exposure. *See, e.g., Western Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 36-37, 437 P.2d 52, 54-55 (1968); *Largent v. State Farm Fire & Cas. Co.*, 116 Or. App. 595, 597-98, 842 P.2d 445, 446 (Or. App. 1992); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of America*, 2014 U.S. Dist. LEXIS 165232, *19 (D. N.J. Nov. 25, 2014); *Cooper v. Travelers Indem. Co.,* 113 Fed. Appx. 198, 200 (9th Cir. Mem. 2004); *Mehl v. The Travelers Home & Marine Ins. Co.*, 2018 U.S. Dist. LEXIS 74552, No. 16-cv-1325 (E.D. Mo. May 2, 2018); *General Mills v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn. Ct. App. 2001); *see also Hughes v. Potomac Ins. Co.*, 199 Cal. App. 2d 239, 248 (1962); *Murray v. State Farm & Cas. Co.*, 509 S.E. 2d 1, 16-17 (W. Va. 1998).

118.    It is well settled law and Insurers over the years have long considered that direct physical loss or damage to property includes business interruption and/or extra expenses resulting from inability to use the property for such claims as:

      a.      Presence of e-coli bacteria;

      b.      Odor from methamphetamine;

      c.      Infestation of spiders;

      d.      Exposure from ammonia, smoke and/or pesticide;

      e.      Fumigation of pesticides that does not allegedly physically or tangibly alter physical property;

      f.      Spread of dust, smoke and soot;

      g.      Presence of carbon monoxide, asbestos, or lead;

      h.      Presence of radioactive dust and/or radon gas;

      i.      Smell of cat urine.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

119.   When countersigning and issuing the new policy of insurance to its insured on April 6, 2020, despite knowing that its insured was not operating related to COVID-19, Allied World did not explain that it believed the policy did not cover COVID-19 claims nor did it offer to refund any policy premiums due to a reduced actuarial risk of a non-operating business.

120.   In its claim denial letter dated April 23, 2021 and its overall claim evaluation process, Allied World, through its third party claims administrator, unreasonably construed its insurance policy as excluding coverage for the presence of and contamination of COVID-19 at its Insureds' premises.

121.   Upon information and belief, in its claim denial letter dated April 23, 2021 and its overall claim evaluation process, Allied World unreasonably concluded that the terms "direct physical loss" and "physical damage" should be given the same meaning when construing coverage for loss.

122.   In its claim denial, Allied World did not consider that the terms "direct physical damage" and "physical loss" must be given different meanings when construing coverage on the policy Allied World issued to Pacific.

123.   Allied World unreasonably rejected that "direct physical loss" is not synonymous with "physical damages."

124.   Allied World unreasonably failed to consider that physical loss or damage to covered property occurs when the premises is uninhabitable or unusable for its intended purpose and COVID-19 is physically present on and alters covered property.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

125.    Allied World unreasonably failed to conclude that accidental physical loss occurs if there exists an imminent threat of and actual release of COVID-19 that causes physical loss of utility to the premises insured by Pacific.

126.    At the time it submitted claims for coverage and continuing forward, the premises insured by Allied World was uninhabitable and/or unusable for its intended purpose and should be considered a physical loss under the Allied World insurance policy.

127.    At the time it submitted claims for coverage and continuing forward, the premises insured by Allied World, the statistically certain presence of COVID-19 at its Insureds premises physically damaged property by physically attaching to and binding to its surfaces through physiochemical reactions involving surfaces on property.

128.    Allied World rejected Pacific's claim for coverage unreasonably with an eye toward denying claims as a cost mitigation strategy rather than acting with equal consideration toward its insured.

129.    Based on the lack of an explicit virus exclusion in its insurance policy with Allied World, Pacific had a reasonable expectation of coverage for losses related to a virus pandemic in its "all risk" insurance policy with Allied World.

130.    Pacific presented a claim for losses exceeding $80,000,000 to Allied World which promised to provide up to $2,000,000 in coverage for up to ten percent of overall claims arising from direct physical loss or damage to property.  The value of such claimed losses presented to Allied World exceeds the limits of the applicable insurance coverage on the Allied World policy issued to Pacific.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

## COUNT ONE—BREACH OF CONTRACT

131.   Trustee incorporates by reference the allegations contained in the paragraphs set forth above.

132.   Allied World promised to provide coverage for claims presented to it in case of losses covered by the terms and conditions of the Policy listing Pacific as insured on its Policy Number 0312-1527-1N.

133.   In connection with Allied World's insurance policy promises made to its insured, Allied World also owed its insured a duty of good faith and fair dealing by virtue of the contractual relationship between Pacific and Allied World.

134.   Allied World accepted timely payment of $119,700 in insurance premiums from its insureds promising to provide coverage in times of loss.

135.   Allied World knew or should have known that its insured was not operating its theater business at the time it countersigned and returned the new commercial policy of insurance to its insured around April 6, 2020 yet did not communicate any coverage limitations to its "all-risk" policy of insurance at the time it issued and delivered the policy to Pacific.

136.   Allied World also accepted $119,700 in insurance premiums for coverage on its all-risk insurance policy issued to its insured based upon a business which was open for operations and not a business that had been closed to the public.  Its failure to offer to return any premiums as a result of business closures breached its obligation to treat its insured fairly and in good faith.

Gutilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

137.   Insured Pacific reasonably expected that its insurer would collect only a premium for coverage that provided Allied World with a fair return based upon its original actuarial calculation of risk and that its premiums would be adjusted if premiums collected became excessive.

138.   Pacific reasonably expected that its carrier would inform it of its insurer's belief the most pressing of risks facing its insured would not be covered when Allied World countersigned, issued and delivered its policy of insurance to Pacific around April 6, 2020.

139.   Allied World did not refund any premiums to its insured when it became aware that Pacific business operations were closed and not open to the public around the time it countersigned, issued and delivered the policy to its insured around April 6, 2020.

140.   Allied World did not disclose to its insured that it did not believe coverage would be available related to COVID-19, the only pressing risk facing its insured around the time it issued and delivered the all-risk commercial insurance policy to its insured Pacific around April 6, 2020.

141.   Allied World's failure to return sufficient premiums to Pacific violated Pacific's reasonable and legitimate expectations that premiums would be limited to no more than fair premiums which would be adjusted downward if they became excessive based on reductions in risk.

142.   Allied World's failure to disclose known policy limitations for known coverage needs at the time it countersigned and issued the policy on April 6, 2020 breached Pacific's reasonable and legitimate expectations that its insurer would act in good faith and reasonably toward its insured.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

143. Allied World's inactions and failure to adjust premiums have deprived Pacific of one of the key benefits of its insurance contract it reasonably expected and constitutes a violation of its obligation of good faith and fair dealing owed by insurer to its insured.

144. These inactions and failures identified above, demonstrate that Allied World gave more weight to its own interests than to the interests of its policy holder Pacific.

145. In addition to the breaches identified above, notwithstanding its promise to provide coverage for claims presented to it in times of loss, Allied World wrongfully and in breach of its agreement to pay for losses, rejected the claim for coverage for business interruption, extra expense, ingress/egress, civil authority and any other sources of coverage for losses at issue in this Complaint.

146. Allied World breached the Policy by failing to and refusing to pay benefits for a claim involving losses which occurred during the applicable policy coverage period and for losses beginning around March 11, 2020.

147. Pacific has been damaged and continues to suffer actual damages and consequential losses as a result of the unpaid claims and interest on these unpaid claims.

148. As a result of the claim denial, Pacific has been compelled to hire counsel and pay fees and costs in an attempt to recover unpaid benefits due under the policy. Moreover, in part as a result of the claim denial, Pacific has terminated business operations entirely and filed for bankruptcy protection pursuant to Chapter 7 of the United States Bankruptcy Code.

149. In addition to unpaid benefits due on the Allied World policy issued to its insured, Pacific suffered additional damages representing the amount of the fees incurred to

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

1    recover damages flowing from said breach including costs and attorneys' fees incurred

2    therein.

3        150.    This action arises out of an insurance contract dispute between the parties and

4    Pacific is entitled to an award of reasonable attorneys fees and costs incurred.

5    **COUNT TWO—VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**

6    **Cal. Bus. & Prof. Code §17200, *et. seq.***

7        151.    Trustee incorporates by reference the allegations contained in the paragraphs

8    set forth above.

9        152.    Trustee pleads the following count only as an alternative legal theory of

10   recovery if other counts do not proceed.

11       153.    Allied World and Pacific are "persons" within the meaning of Cal. Bus. & Prof

12   Code §17201.

13       154.    Under California law, unfair competition has been defined to include "any

14   unlawful, unfair or fraudulent business act or practice …" Cal. Bus. & Prof. Code §17200.

15       155.    Allied World charged its insureds a premium of $119,700 for commercial

16   property insurance coverage policy number 0132-1527-1N based in part upon the known

17   underwriting and actuarial risk known to Allied World and based upon its knowledge that

18   Pacific's business locations were open to the public and generating revenue of at least

19   $80,000,000.

20       156.    Allied World issued its commercial property insurance policy number 0132-

21   1572-1N insurance policy to its insureds for coverage period December 15, 2019 through

22   December 15, 2020.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

157.    By approximately March 11, 2020, all or most of the Pacific theater locations had closed down operations ceasing to be open to the public and failing to generate any significant revenue from operations.

158.    By March 16, 2020, all state governments where Pacific theaters had been operating in California, Maryland, Massachusetts and Illinois has issued government shutdown orders to Pacific and other businesses shutting down all operations to the public.

159.    By April 6, 2020, the time in which Allied World signed and returned a fully executed copy of the Pacific policy to its insureds, the actuarial and underwriting risks to insurer Allied World were substantially less than existed while Pacific theater operations were open to the public in each of its multiple property locations.

160.    Around April 6, 2020, the date on which Allied World's corporate representative countersigned and returned its fully executed commercial property insurance policy to its insured Pacific, all of Pacific's theater operations had closed down operations to the public, were not generating customer revenue and this change in actuarial and underwriting risks were well- known by Allied World at the time its corporate representative countersigned and returned the commercial insurance policy to its insured.

161.    Around April 6, 2020, the actuarial risks to Allied World were substantially different and substantially less risky to Allied World because its insureds had fully shut down its operations and not one theater location was open to the public generating revenue due  to COVID-19 and in compliance with government shutdown orders in California, Maryland, Massachusetts and Illinois.

162.    Despite the fact that actuarial and underwriting risks had been substantially reduced by April 6, 2020, at the time Allied World countersigned and returned the new commercial insurance policy number 0132-1527-1N to its insured, Allied World did not make any form of restitution or return any part of its premiums that it charged its insured and which its insured paid to Allied World for its all-risk policy of insurance.

163.    As of April 6, 2020 Allied World benefitted in the form of substantially reduced actuarial and underwriting risks flowing from insuring vacant unused properties versus insuring occupied business properties open to the public which were generating revenue at the time it countersigned and issued the commercial insurance policy to its insured.

164.    By April 6, 2020, almost all material risks facing Pacific that formed an actuarial and underwriting basis for premiums charged by Allied World ceased to exist and the new policy issued to Pacific provided illusory coverage tantamount to a functional cancellation of coverage.

165.    On April 13, 2020, the California Insurance Commissioner Ricardo Lara issued a bulletin to "All Property and Casualty Insurers and Workers Compensation Insurers regarding "Premium Refunds, Credits and Reductions in Response to COVID-19 Pandemic." https://www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/upload/Bulletin_2020-3_re_covid-19_premium_reductions-2.pdf.

166.    In this memorandum, the California Department of Insurance Commissioner first agreed that reduced driving has resulted in fewer risks to automobile insurers leading to a reduction in automobile insurance premiums.  The Commissioner then explained that

reductions in risk "extended beyond automobile line(s) of insurance…. [and required] broader premium reductions for other lines of insurance…"  The commissioner directed insurance industry representatives to refund premiums for lines of coverage including commercial liability insurance "where the measures of risk have become substantially overstated as a result of the pandemic."

167.    At the time Allied World countersigned and issued policy number 0132-1527-1N to its insureds on or about April 6, 2020, it had become abundantly clear that the measures of risk had become substantially overstated as a result of the pandemic.

168.    On or about April 6, 2020 and later, Allied World did not reduce premiums charged to its insured to accurately measure the risk which was substantially overstated at the time it delivered a fully countersigned policy to its insured and in later months.  Allied World had knowledge of the substantially overstated risks facing its insured as a result of the pandemic yet did not return any premiums to its insureds.

169.    As a result of its receipt of premiums which substantially overstated the actuarial and underwriting risk facing Allied World enriching Allied World as a result, it was improperly and unreasonably enriched by its insured; it would be unjust for Allied World to retain these improper premium benefits it received by failing to return premiums that would have more accurately reflected risks.

170.    Allied World acted unfairly in violation of Cal. Bus. & Prof. Code §17200 by wrongfully retaining all policy premiums which it retained despite measurable changes in risk and must make restitution to Pacific in the amount of the wrongfully retained insurance premiums.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

171.    Allied World's retention of full premiums that were paid by Pacific which should have been refunded without regard for a minimum earned premium constitutes an unlawful and unenforceable penalty that is unconscionable, both procedurally and substantively, under California law and contrary to the public policy of California. Defendant's failure to refund premiums and application of a minimum earned premium in this manner was improperly intended to punish and/or deter Pacific from asserting its rights and remedies under the policy, receiving refunds irrespective of any minimum earned premium terms and acts as an illegal liquidated damages provision meant to punish its insured who asserts rights as a policyholder. Such provision is unlawful under well-established law governing unenforceable penalties in contracts made in California, and Defendant's failure to at least provide a full disclosure of the cancellation fee is unlawful under CAL. INS. CODE § 481(c)(1).

172.    Pacific is entitled to restitution of any unauthorized penalty amounts paid to or otherwise retained by Allied World as it is not entitled to keep these ill-gotten gains. In equity and in good conscious, Allied World is obligated to provide Pacific with restitution of any unlawful penalties it collected and/or retained.

## **COUNT THREE—BAD FAITH**

173.    Trustee incorporates by this reference the allegations contained in the paragraphs set forth above.

174.    The Policy providing coverage to Pacific includes an implied obligation to act in good faith and deal fairly with regard to its investigation of claims, coverage

determinations and with regard to treatment of its insureds with equal consideration to its own interests.

175.    The duty of good faith and fair dealing is non-delegable and belongs to Allied World and all of its agents acting on its behalf.

176.    Allied World continues to owe its insured an obligation of good faith and fair dealing.

177.    During the course of issuing a new policy to its insured, disclosing coverage limitations to its insureds, determining when to issue a refund in premiums and during the scope of its investigation for coverage, Allied World and its third party claims administrator breached its duty of good faith and fair dealing owed to Pacific.

178.    Specifically, Allied World breached the duty of good faith and fair dealing by failing to disclose coverage limitations at the time it countersigned, issued and delivered the policy to Pacific, failing to return premiums which would more accurately reflect risk and by denying a legitimate claim presented by Pacific, cherry-picking and misinterpreting various policy terms, failing to conduct a reasonable investigation including reviewing records and information that supports a claim denial and failing to construe policy provisions properly and reasonably.

179.    Allied World further breached its duty of good faith and fair dealing by failing to adequately and timely investigate claims and information tending to support payment of claims submitted to it by the Pacific later forcing its insured to later file for bankruptcy protection.

180.    Allied World further breached its duty of good faith and fair dealing by unreasonably denying adjustment and payment of claims for payment presented to it and forcing its insured to jump through arbitrary, costly and unnecessary litigation hoops to consider its claim and to attempt to force litigation to save it from costly claims that could have but were not excluded before it issued Pacific a policy of insurance.

181.    Allied World further breached its duty of good faith and fair dealing by failing to treat Pacific reasonably and with the equal consideration to that of its own interests in saving expense and minimizing claims payments.

182.    Allied World further breached its duty of good faith and fair dealing owed to its insured Pacific by failing to consider that coverage exists when as here, it produced direct physical loss of or damage to property.

183.    Upon information and belief, Allied World breached its duty of good faith and fair dealing owed to its insured Pacific by unreasonably relying on an improper national standard to deny claims presented to it by its insureds and by conducting an unreasonable and improper claims evaluation with an eye toward denying coverage rather than treating its insured fairly.

184.    Allied World systematically and unreasonably denied Pacific's claims for coverage presented to it without conducting any reasonable investigation of specific facts and circumstances involved.

185.    Allied World did not reasonably consider all applicable and relevant facts and circumstances involved in the claim presented by Pacific based upon its own financial interests without giving equal consideration to the interest of its insured.

186.    Allied World's claims investigation process was wholly unreasonable, omitted any reasonable consideration for the facts and circumstances involved and failed to give due consideration to Pacific's claims and interests presented to it.

187.    Allied World continues to improperly stand by its claim denial and continues to act unreasonably knowing that its conduct has been and continues to be unreasonable.

188.    Allied World knew, should have known and/or was conscious of the fact that its conduct denying the claim presented to it for loss has been and continues to be unreasonable.

189.    As a direct and proximate result of Allied World's wrongful conduct, Pacific suffered damages, and will continue to suffer damages in the amount of the unreasonably delayed benefits due under the policy in an amount to be proven at trial.

190.    As a further direct and proximate result of Allied World's wrongful conduct, Pacific suffered and continues to suffer damages in the amount of pre- and post-judgment interest upon the amount of benefits that Defendant has unreasonably denied and in amount to be proven at trial.

191.    In part as a result of the claim denial, Pacific has been forced to file for bankruptcy protection and wind down its operations entirely and has been compelled to hire counsel and pay fees and costs in an attempt to recover unpaid benefits due under the policy. So in addition to unpaid benefits due on the Allied World policy, Pacific suffered additional damages representing the amount of the fees incurred to recover damages flowing from said breach including costs and attorneys' fees incurred therein.

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

## COUNT FOUR—NEGLIGENT MISREPRESENTATION

192.    Trustee incorporates by this reference the allegations contained in the paragraphs set forth above.

193.    The elements of a negligent misrepresentation claim are (1) misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the misrepresentation, and (5) resulting damage.  National  Union Fire Ins. Co of Pittsburgh v Cambridge Integ. Serv. Grp., Inc., 171 Cal.App.4th 35, 50, 89 Cal Rptr. 3d 473, 483 (2009).

194.    Allied World represented to the public and its policyholders, "[W]e don't approach casualty insurance like everyone else. Instead, we provide comprehensive coverage, with a personalized approach because we understand that "one size doesn't fit all." Our expert underwriters craft coverage for the unique exposures and we work together on every policy we issue to make sure there are no gaps or costly overlaps.  With a broad industry appetite, we are open to most classifications of business. We will leverage our specialized expertise and industry knowledge to develop customized coverage for each insured whether be a Fortune 1000 company, public and governmental entities or a small not-for-profit. We are a quality provider of both primary and excess casualty products across a broad range of industries."

195.    Allied World promises its policyholders, "We have extensive knowledge by line of business and claim type, and are committed to the highest levels of professionalism, responsiveness and good faith in claims handling. Further, we pride ourselves on understanding your needs and your business long before you have a claim."

43

196.    By making these promises to its policyholders, Allied World intended for Pacific to rely or knew it would reasonably rely on representations it made publicly.

197.    Allied World also promised to provide Pacific with business interruption and extra expense insurance coverage and it made other representations and promises which were spelled out in its policy booklet that it countersigned and returned to its policy holder around April 6, 2020.

198.    Allied World promises its policyholders that "Allied World takes great pride in providing policyholders with proactive and open dialogue during the entire claims-handling process. When it comes to our proven claims track record, we like our numbers to speak for themselves."

199.    On or around April 6, 2020, the only pressing and substantial risk facing its insureds related to COVID-19, yet at the time it countersigned and returned the new policy to its insureds, Allied World failed to represent to its insureds with an open and proactive dialogue  that it would not cover any claims relating to this known and substantial risk.

200.    On or around April 6, 2020, Allied World neither informed its insureds that it would not provide coverage for COVID-19 related claims nor did it refund any premiums paid for insurance coverage that presented it with substantially different and lower risks to the carrier and as a result created the false impression to its insureds that it would cover all COVID-19 related claims for coverage.

201.    In its marketing and business materials, Allied World promised to provide "open and proactive dialogue."

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

202.   Allied World intended that its insureds rely on its representations and omissions of material facts concerning coverage extended to its insureds around April 6, 2020 and express promises of an open and proactive dialogue represented to its insureds.

203.   Notwithstanding representations that gave its insureds the impression that coverage for COVID-19 related claims would be provided for Pacific when it countersigned and delivered the insurance policy to its insured during the throws of the pandemic, Allied World omitted key material information to its insured that it would not consider or provide coverage for any claims made to it relating to COVID-19 and that it would retain all insurance premiums paid for coverage despite the material changes in actuarial risks at the time it returned a countersigned policy to its insureds.

204.   Allied World had no basis or reasonable grounds to believe omission from disclosure of material facts about coverage limitations was a proper course of action because disclosures were required to make facts true as it perceived them during the height of the pandemic.

205.   Allied World's decision to countersign and deliver the insurance policy number 0132-1572-1N to its insureds without affirmatively disclaiming COVID-19 related business interruption coverage and without offering to return some or all policy premiums while businesses it insured were closed and shut down from operations across the country was an omission of material facts with no reasonable grounds for believing it's insureds would not believe coverage to exist.

45

206. By countersigning and returning insurance policy number 0132-1572-1N to its insureds around April 6, 2020, Allied World intended for its insureds to rely on its misrepresentations and omission of material facts concerning coverage limitations.

207. Allied World's failure to communicate material key information about its perceived limitations on coverage to its insured and omissions about retaining policy premiums omitted material facts, misrepresented applicable coverage, created the false impression and misrepresented by omission key information to Plaintiff about lack of insurance coverage afforded to Plaintiff in the course of its insurance business transaction with Pacific.

208. Allied World intended for Pacific to rely or knew it would reasonably rely on incorrect coverage conclusions omitted from the policy delivery materials provided to its insureds around April 6, 2020 yet later identified in its coverage denial letter to its insured dated April 23, 2021.

209. By failing to communicate all relevant information about coverage and its pre-claim conclusion that coverage would not extend to the only pressing risks facing insureds around April 6, 2020, Allied World misrepresented and omitted material details about the nature of the insurance products sold to its insureds and the open dialogue it promised to its insureds.

210. Allied World failed to exercise reasonable care in obtaining or communicating the correct information to its policyholder about both its coverage investigation and coverage promised to its insureds and for which its insureds reasonably expected would exist because

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

1  its insurer said nothing about limitations at the time it countersigned and delivered the

2  insurance policy to its insured in April, 2020.

3      211.    When it made claims for coverage, Pacific justifiably relied on Allied World's

4  representations and omissions made around April 6, 2020 that it would serve policyholders,

5  and would be proactive with an open dialogue with its policyholders.

6      212.    Pacific suffered resulting damages as a direct and proximate result of Allied

7  World's negligent misrepresentations and material omissions made to its policyholders about

8  coverage, alleged limitations concerning the COVID-19 pandemic, and an open dialogue and

9  unique understanding about exposures facing its insureds.

10      **COUNT FIVE—DECLARATORY JUDGMENT**

11      213.    Trustee incorporates by references the allegations contained in the paragraphs

12  set forth above.

13      214.    As set forth above, Allied World sold Pacific insurance which protected it

14  against direct physical loss or damage to property.  Pacific expected coverage for business

15  interruption losses, extra expenses, and other costs for decontamination and remediation

16  expenses resulting from and related to all losses from the COVID-19 virus.  The losses were

17  estimated to exceed $80,000,000 triggering not only coverage on the Allied World policy but

18  also policy limits of coverage which should have been immediately made available to Pacific.

19      215.    The rights, status and legal relations of the parties are affected due to Allied

20  World's improper contention that it may deny coverage for the loss claims made by Pacific.

21      216.    Allied World's claim denial contending that its insured did not present a claim

22  covered by the Policy constitutes unreasonable conduct, is wrongful, violates Pacific's

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

47

reasonable expectations that it would be covered in case of loss occurring during the coverage period and is tantamount to acting unreasonably and converting monies which should have been used to pay this claim.

217.    Allied World has refused to and continues to refuse to provide coverage for the claim for coverage presented to it by its insureds.

218.    Allied World's claim denial was wrongful, forms an improper basis from which it denies coverage and presents an actual and justiciable controversy between the parties as to the respective rights and obligations under the policy.

219.    Pacific seeks a judicial determination to resolve the present controversy over the coverage owed it on the policy.

220.    As a direct and proximate result of Allied World's breach of contract and refusal to acknowledge its coverage obligations, Pacific suffered substantial harm which contributed to the bankruptcy filing.

221.    Issuing declaratory relief by this Court would terminate some of the existing controversy between the parties.

WHEREFORE, Trustee respectfully requests that the Court grant the following relief against Allied World as follows:

A.    Entering judgment in favor of Pacific on its breach of contract claim against Allied World, ordering it to pay all compensatory and consequential damages arising or resulting from the Allied World's breach of the terms of its policy;

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

Guttilla Murphy Anderson, P.C.
5415 E. High Street, Suite 200
Phoenix, AZ 85054
(480) 304-8300

B.      Entering a judgment in favor of Pacific for compensatory damages and restitution resulting from Allied World's unjustly becoming enriched by retaining full premiums paid for coverage.

C.      Entering judgment in favor of Pacific for compensatory damages occurring as a direct and proximate result of Allied World's breach of its implied covenant of good faith and fair dealing;

D.      Entering a judgment representing compensatory damages as a result of Allied World's negligently omitting, misrepresentation and false impression that insurance coverage would exist for claims for damages flowing from COVID-19 related claims as alleged in this Complaint;

E.      Entering a declaratory judgment that the Policy provides coverage to Pacific for the claim presented to Allied World and ordering it to reimburse Pacific for the full extent of its losses required by the terms and conditions of the policy;

F.      Awarding Pacific prejudgment interest;

G.      Awarding Pacific its costs and reasonable attorneys' fees incurred herein pursuant to the policy and or other applicable rule, statute and the Policy; and

H.      For such other relief as the Court deems just and proper.

Dated this 6th day of June 2023.

                              GUTTILLA MURPHY ANDERSON, P.C.

                              /s/ Ryan W. Anderson
                              Ryan W. Anderson
                              Co-Special Insurance Counsel for the Chapter 7 Trustee

3286-002 (506984)